**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**PETER BERNEGGER**                                                                    **MOVANT**

**v.**                                                                           **No. 1:07CR176-MPM**

**UNITED STATES OF AMERICA**                                              **RESPONDENT**

## MEMORANDUM OPINION

This matter comes before the court on the motion of Peter Bernegger to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. The government has responded to the motion, and the matter is ripe for resolution. For the reasons set forth below, the instant motion to vacate, set aside, or correct sentence will be denied.

### Facts and Procedural Posture

Petitioner Peter Bernegger was charged in five counts of a six-count Superseding Indictment alleging mail fraud, wire fraud, conspiracy to commit mail and wire fraud, and bank fraud. Bernegger's business partner, Stephen Finch, was also charged in the Superseding Indictment ("Indictment"). The Indictment described a general scheme in which Bernegger and Finch made fraudulent misrepresentations to investors and potential investors to induce them to invest in various business ventures of Bernegger and Finch. Specific counts charged either Bernegger (Counts Two, Three, and Four) or Finch (Count One) with specific acts of mail fraud or wire fraud within the framework of the overall scheme. Count Five charged both Bernegger and Finch with conspiracy to commit acts of mail and wire fraud. Count Six charged Bernegger with bank fraud, alleging that he also made fraudulent misrepresentations to a local bank in order to secure a loan for the business. The defendants proceeded to trial on November 2, 2009. On November 12, 2009, Finch was acquitted of

all charges while Bernegger was convicted on Counts Three, Four, and Six.  On May 13, 2010, Bernegger was sentenced to 70 months in prison and ordered to pay restitution in the approximate amount of $2.2 million.  Bernegger appealed his conviction to the Fifth Circuit, which issued an order dated October 20, 2011, affirming the conviction and the length of the sentence, but modifying the amount of restitution by reducing it to $1,725,000.00.  On February 12, 2012, Bernegger filed the present motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, and he has added or amended claims numerous times since then.

### Scope of § 2255 Review

There are four grounds upon which a federal prisoner may seek to vacate, set aside, or correct his sentence:  (1) that the sentence was imposed in violation of the Constitution or laws of the United States; (2) that the court was without jurisdiction to impose the sentence; (3) that the sentence exceeds the statutory maximum sentence; or (4) that the sentence is "otherwise subject to collateral attack."  28 U.S.C. § 2255; *see United States v. Cates*, 952 F.2d 149, 151 (5th Cir.1992).  The scope of relief under § 2255 is the same as that of a petition for a writ of *habeas corpus*. *Cates*, 952 F.2d at 151.

A defendant seeking relief under 28 U.S.C. § 2255 may not do so to raise issues that could have been raised on appeal.  *United States v. Walling*, 982 F.2d 447, 448-449 (10th Cir. 1992).   A petitioner may not raise constitutional issues for the first time on post-conviction collateral review unless he shows cause for failing to raise the issue on direct appeal and actual prejudice resulting from the error.  *United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992), *cert. denied*, 506 U.S. 1007 (1992);  *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991).  The burden of showing "cause," an "objective factor external to the defense," rests with the petitioner.  *McCleskey v. Zant*, 111 S.Ct. 1454, 1470 (1991).  No other types of errors may be raised on collateral review unless the petitioner

demonstrates that the error could not have been raised on direct appeal, and if not corrected, would result in a complete miscarriage of justice. *Pierce*, 959 F.2d at 1301;  *Shaid*, 937 F.2d at 232.  Further, if a claim is raised and considered on direct appeal, a defendant is may not raise the issue in a later collateral attack.  *Moore v. United States*, 598 F.2d 439, 441 (5th Cir. 1979).

## Bernegger's § 2255 Claims

In the instant § 2255 motion, Bernegger makes the following claims for relief, which the court has restated for brevity and clarity:[1]

1. He was denied a trial by jury as to Count 1 of the indictment because that count was excluded from the Form of the Verdict submitted to the jury.

2. He was denied the right to a public trial because the court excluded Count 1 from the Form of the Verdict submitted to the jury.

3. The court violated Fed. R. Crim. P. 48(a) by excluding Count 1 of the indictment from the Form of the Verdict submitted to the jury.

4. Various acts characterized as "fraud upon the court" divested the court of subject matter jurisdiction.  The "fraud" centered around excluding Count 1 of the indictment from the Form of the Verdict submitted to the jury.

5. The government committed various violations under *Brady* and Fed. R. Crim. P. 16(a) and 16(c).

6. The judge presiding over the case was biased against Bernegger for a variety of reasons.

7. Violation of *Brady* by suppressing FBI test results showing that We Gel actually produced a useable protein product.

---

[1] Bernegger has submitted new claims for his § 2255 motion through various means, and he has numbered them 1 – 31.  There were, however, gaps in the numbered claims on the docket, and the court gave Bernegger the opportunity to submit any claims that seemed to be missing.  Bernegger requested an extension of the deadline to submit these claims, and he has submitted most of them. The court still cannot locate any claims numbered 27, 29, or 30, and Bernegger's deadline for adding claims has now expired.  As such, the court will consider only the claims submitted before the extended deadline.

8. The promulgation of an FBI "victim letter" two years before Bernegger was indicted in this matter.

9. Violation of the confrontation clause due to the illness and ultimate death of Leo Bieneck, one who accused Bernegger of fraud.

10. Appellate counsel's decision not to pursue the propriety of the trial court's decision to close the courtroom to determine whether witness Kisner's testimony was subject to a valid confidentiality agreement.

11. Kisner's testimony as a victim should have been excluded because Kisner, himself, invested no money in Bernegger's companies; instead, Kisner's father was the actual investor.

12. The court failed to submit a jury instruction on the definition of "letter of intent."

13. The government committed *Brady* and Fed. R. Crim. P. 16 violations when investigators damaged two of Bernegger's computers beyond repair. Bernegger had thousands of documents on the computers which he believes would have exonerated him by showing robust business dealings, customers, and production of large amounts of useable product.

14. Counsel was ineffective by ignoring the government's stipulation that We Gel tried to make useable product, and indeed made some useable product. Counsel should have used the stipulation to defeat the government's claim that Bernegger and his companies had no viable product for sale.

15. The computation to determine Bernegger's sentencing range and restitution included amounts of money not supported in the trial record or Presentence Investigation Report.

16. Counsel was ineffective for failing to investigate Bernegger's dealings with various people, failing to use thousands documents Bernegger provided, failing to employ the investigator Bernegger recruited, and failing to call various witnesses Bernegger believes would have aided in his defense.

17. Counsel was ineffective in failing to challenge use of CPI investors to compute relevant conduct, as none of those investors was named in the indictment.

18. Counsel should have objected to use of the $100,000 invested by Craig Trebatoski in computing loss and restitution, as Trebatoski was not a victim of fraud.

19. As Bernegger was not charged in Count 1 of the indictment, he could not be found guilty of any of the other charges, as none of those charges alleged as scheme to defraud.

20. Bernegger's sentence was improper because, without Count 1, the other counts failed to state a

criminal charge.

21. Bernegger was improperly arraigned because the arraignment included all 6 counts of the indictment, while Bernegger was only charged with 5.

22. The indictment was improper because it charged 6 offenses, but Bernegger was actually only charged with 5.

23. The indictment was faulty because CPI was only mentioned in Count 1, under which Bernegger was not charged. In addition, We Gel was mentioned only in Counts 2, 3, 4, and 6, which failed to state a valid criminal charge because none of them included the element of a scheme to defraud. The jury found Bernegger not guilty of Count 5.

24A. Trial and appellate counsel were ineffective for failing to raise the issue of estoppel regarding the government's alleged initial position to charge Bernegger in Count 1 of the indictment, then later position that Bernegger was not charged in Count 1.

24B. Bernegger was denied the right to be present during all proceedings because he was out of the courtroom, but just happened to walk by, when the court removed Count 1 of the

indictment from the Form of the Verdict submitted to the jury.

25. The government had *ex parte* communication with the court by suggesting that Count 1 of the indictment be removed from the Form of the Verdict outside Bernegger's presence.

26. The prosecutors lied regarding the government's original position as to whether Bernegger was charged in Count 1 of the indictment, as neither was present during earlier proceedings when that position was discussed.

27. Claim is missing and will not be considered.

28. The court did not submit Count 1 of the indictment to the jury in violation of the holdings in *Booker* and *Apprendi*.

29. Claim is missing and will not be considered.

30. Claim is missing and will not be considered.

31. The government violated *Brady* and Fed. R. Crim. P. 16 by suppressing an FBI report in which Agent James Burton interviewed alleged victim Clark Young, stating that Young wrote two personal checks and handed them directly to Bernegger – an act not constituting mail fraud. As a result, $75,000 (the total amount of the checks), must be deducted from calculations regarding sentencing and restitution.

**Categorizing Bernegger's Claims**

To say the least, Mr. Bernegger's motion under 28 U.S.C. § 2255, along with its many addenda, supplements, and amendments, is lengthy. It took the court a great deal of time simply to create the above summary of his claims. The initial § 2255 motion is 170 pages, and the various additions total nearly that number. Bernegger's many claims can, however, be divided into several groups for more expeditious handling. Some claims are included in more than one group.

The first group comprises Bernegger's allegations regarding the court's decision to exclude Count 1 of the Superseding Indictment from the jury's consideration. Contained in this group are Grounds 1, 2, 3, 4, 19, 20, 21, 22, 23, 24A, 24B, 25, 26, 28 – and parts of Grounds 5 and 6. These claims are procedurally barred and must be dismissed for that reason. However, the court will discuss below, one last time, the merits of this issue – the one on which Mr. Bernegger has focused the motion attention.

The second group includes claims already considered and rejected by the Fifth Circuit Court of Appeals – including those in the first group (involving the removal of Count 1 of the Superseding Indictment from the Form of the Verdict). The court cannot review these claims under 28 U.S.C. § 2255 because they are procedurally barred. These claims include all of the allegations contained in the first group, as well as Grounds 10, 11, 12, 15, 17, 18, and also parts of Grounds 5 and 6.

The third group consists of claims that Bernegger could have raised on direct appeal but did not. The court cannot review such claims for the first time in a proceeding under 28 U.S.C. § 2255 because they are procedurally defaulted. These claims are contained in Grounds 7, 8, 9, 13, 15, 17, 18, 31, and parts of Ground 5 and 6.

The fourth group of claims includes those in which Mr. Bernegger challenges the calculation of the amount of restitution he must repay to the victims. These claims include Grounds 15, 17, 18, and part of 31. These grounds for relief must be dismissed because they cannot be challenged through a *habeas corpus* proceeding.

The fifth group comprises allegations that the counsel provided ineffective assistance. These claims are found in Grounds 9, 10, 11, 12, 14, 17, 18, 24A, 24B, 28, 31, and parts of 6 and 16. These grounds for relief will be dismissed because they are without substantive merit.

Finally, the sixth group comprises allegations that the government failed to turn over exculpatory evidence to Mr. Bernegger. These claims include Grounds 7, 8, 13, 31, and parts of Grounds 5 and 6. These grounds for relief will also be dismissed for want of substantive merit.

As discussed below, the court will deny all grounds for relief in the first four groups as procedurally defaulted, procedurally barred, or outside the scope of § 2255 relief. Thus, the fifth and sixth groups of Bernegger's claims consist of those that the court will consider on the merits.

### Group 1: Bernegger's Focus on Count 1 of the Indictment

In discussing the format of the Indictment, the Fifth Circuit held that the Indictment stated valid charges as to the crimes of Mr. Bernegger's conviction – and that Count 1 of the indictment charged only Mr. Finch, not Bernegger. Thus, as discussed below, this court is foreclosed from considering these issues on collateral review through Bernegger's motion under 28 U.S.C. § 2255. Nonetheless, for Mr. Bernegger's benefit, the court will try one last time to clarify the issue for him. Mr. Bernegger argues vigorously that he was charged with a crime in Count 1 of the Indictment – and that the court erred – and the prosecutors and others committed malfeasance – by amending the Form of the Verdict to remove Count 1 from the jury's consideration. This had the effect of precluding the

jury from finding Mr. Bernegger guilty on Count 1 – which the Fifth Circuit has ruled was proper. Indeed, defense counsel argued for – and obtained – a clarifying instruction for the jury to *ensure* that none of the jurors believed Bernegger was charged in Count 1.

Nevertheless, Mr. Bernegger repeatedly argues that he had the right to a trial by jury on Count 1 of the Indictment and that the court blocked him from exercising that right. The government argues that it never intended charge Mr. Bernegger in Count 1, that the language in Count 1 did not charge him, and that its inclusion in the original Form of the Verdict was simply a scrivener's error, one which the government and the court corrected during a break for lunch. Mr. Bernegger takes umbrage with this position and states that the government took the opposite position innumerable times until nearly the end of trial, and only then stated that Count 1 did not charge Bernegger with a crime. Thus, Mr. Bernegger now argues that Count 1 charged a crime against him and that he wanted the jury to consider that charge in its deliberations.

However, in a completely contrary view, Mr. Bernegger also argues that he was *not* charged with a crime in Count 1 (the only count containing language regarding a scheme to defraud); thus, the other counts failed to charge him with a crime. He reasons that, as a scheme to defraud is an element of the remaining counts in the indictment, the failure to charge him in Count 1 (which contains the only reference regarding a scheme to defraud) leaves the other counts short of the elements required to state a valid charge against him. Mr. Bernegger is mistaken. As the Fifth Circuit held, the remaining counts in the Indictment incorporate by reference each of the preceding ones.[2] Thus, though he was not *charged* in Count 1, the facts and language regarding a scheme to defraud are part of the

---

[2] Mr. Bernegger certainly understands the concept and utility of incorporating earlier portions of a document into later portions, as he has done so innumerable times in his submissions to the court.

remaining counts, and all elements for each crime charged are present.

Put simply, the court has no idea why Mr. Bernegger wishes that the jury could have considered his guilt or innocence as to an additional crime. The end result of the court's decision is that Bernegger faced one less criminal charge. Bernegger's trial counsel stated on the record that he heartily approved of the court's decision, and rightly so. Thus, Bergengger benefited from the exclusion of Count 1 from the form of the verdict – and from the court's instruction to the jury making clear that Bernegger was not charged in Count 1. The Fifth Circuit explained this succinctly in its ruling on the issue. Indeed permitting Count 1 to go to the jury as to Mr. Bernegger would likely have constituted reversible error. In any event, as discussed in the next section, any of Mr. Bernegger's grounds for relief involving the proper interpretation of the Superseding Indictment – and its effect on the proceedings – are procedurally barred because the Fifth Circuit has already ruled on that issue.

### Groups 1, 2 and 3: Procedural Default and Procedural Bar[3]

A defendant seeking relief under 28 U.S.C. § 2255 may not assert claims that could have been raised on appeal, but were not. *United States v. Walling*, 982 F.2d 447, 448-449 (10th Cir. 1992). Such claims are procedurally defaulted. A defendant may not raise constitutional issues for the first time on post-conviction collateral review unless he shows cause for the default and actual prejudice resulting from the error. *United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992), *cert. denied*, 506 U.S. 1007 (1992); *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991). The burden of showing "cause," an "objective factor external to the defense," rests with the petitioner. *McCleskey v. Zant*, 111 S.Ct. 1454, 1470 (1991). If the defendant cannot show cause and prejudice to lift him over the barrier

---

[3] Though the grounds for relief set forth in Groups 1, 2, and 3 are either procedurally defaulted or barred, the court will also discuss the merits of some of the claims.

of procedural default, then to proceed he must show that the error could not have been raised on direct appeal, and if not corrected, would result in a complete miscarriage of justice. *Pierce*, 959 F.2d at 1301; *Shaid*, 937 F.2d at 232. Further, if a claim is raised and considered on direct appeal, a defendant may not raise the issue later through collateral attack. *Moore v. United States*, 598 F.2d 439, 441 (5th Cir. 1979). Such claims are procedurally barred.

The following claims in the instant motion under 28 U.S.C. § 2255 have been procedurally defaulted because they were not raised in Mr. Bernegger's direct appeal: Grounds 8, 13, and parts of Ground 5, 6, and 9. In addition, Bernegger's allegations in Grounds 1, 2, 3, 4, 10, 11, 12, 15, 17, 18, 19, 20, 21, 22, 23, 24A, 24B, 25, 26, 28, and 31, as well as other parts of Grounds 5 and 6, are procedurally barred because he raised them on appeal, and the Fifth Circuit rejected his arguments. Bernegger has not proven an objective factor external to his defense to show cause for his default.[4] Neither has he shown how application of the default would cause actual prejudice to his defense. Finally, he has neither alleged nor proven that a fundamental miscarriage of justice would occur if the court applies the default. For these reasons, the court holds that Mr. Bernegger's allegations raised in parts of Grounds 5, 6, and 9, as well as in Grounds 1, 2, 3, 4, 8, 10, 11, 12, 13, 15, 17, 18, 19, 20, 21, 22, 23, 24A, 24B, 25, 26, 28, and 31 will be dismissed under the doctrines of either procedural default or procedural bar.

---

[4] As discussed below, the court will also discuss Ground 8 and parts of Grounds 5 and 6 on the merits because Bernegger alleges that the government withheld information regarding those grounds during discovery.

## Identifying the Many Sub-Claims in Grounds 5 and 6
## to Analyze Procedural Default and Procedural Bar

Mr. Bernegger listed many sub-parts to Grounds 5 and 6; thus, to avoid confusion, the court will list which parts of these grounds for relief were raised on appeal – and which were not.  The following parts of Ground 5 were *not* raised on direct appeal and thus have been procedurally defaulted:  (1) the destruction of two computers, (2) hiding the destruction from the court, (3) violation of Fed. R. Crim. P. 23(a) (right to a jury trial), 48(a) (improper dismissal of charges), and Fed. R. Civ. P. 77(b) (improper carrying out of court's business), (4) showing a potential trial witness the indictment while it was still sealed, (5) creating and filing false pleadings with the court, (6) misrepresenting the chronology of events to make it seem as if Mr. Bernegger lied, and (7) obtaining a conviction through fraud upon the court.

In contrast, the following parts of Ground 5 (largely dealing with prosecutorial misconduct and Count 1 of the Indictment) *were* raised on direct appeal, rejected by the Fifth Circuit, and are thus procedurally barred:  (1) informing the court that Mr. Bernegger was never charged in Count 1 of the Indictment[5], (2) removing Count 1 of the Indictment from the verdict form, (3) offering a plea deal to Mr. Bernegger to all counts of the Indictment, including Count 1, (4) changing the verdict form (to exclude Count 1) outside the view of the public, (5) amending the indictment through changing the form of the verdict (to exclude Count 1), (6) lying to the court about the reason for changing the verdict form, (7) creating and filing false pleadings (the verdict form) with the court, (8) lying about

---

[5] The Fifth Circuit has upheld the validity of the Indictment – and held that it was proper to find Mr. Bernegger guilty on the other counts, though he was not charged with an offense in Count 1.  For this reason, the court holds that any of Bernegger's grounds for relief based upon the validity of the Indictment – and the court's decision not to present Count 1 to the jury for consideration on the verdict form – have already been ruled upon by the Fifth Circuit.  Thus, this court may not address the issue a second time in Bernegger's request for § 2255 relief.

knowledge of a confidentiality agreement between Kisner and others, (9) using false information (regarding total amount of loss) during sentencing to increase Bernegger's punishment, (10) trying to convict Mr. Bernegger of Count 1 of the Indictment until just before the end of trial, and (11) obtaining a conviction and sentence through "fraud upon the court" (removing Count 1 from the jury's consideration).

The following allegations in Ground 6 were *not* raised on direct appeal and are thus procedurally defaulted:  (1) the court spoke with unidentified witnesses (at a bond hearing), (2) the government did not call those witnesses (at a bond hearing), (3) the court compelled Bernegger to sign a bond agreement before he could be release on bond, (4) the court permitted Susan Hurst (Bernegger's secretary) to testify, though Bernegger believes that her testimony was compromised, and (5) the court violated Bernegger's 5th, 6th, and 8th Amendment rights,

The following allegations in Ground 6 *were* raised on direct appeal and rejected by the Fifth Circuit and are thus procedurally barred:  (1) the court threatened Bernegger with contempt of court if he divulged any of Mr. Kisner's testimony given under seal, (2) the court remained silent when Count 1 was removed from the Form of the Verdict, (3) the court filed fraudulent orders and judgments (regarding Count 1 of the indictment), (4) the court violated Bernegger's rights under the 5th, 6th, and 8th amendment rights (regarding Count 1), (5) the court permitted the removal of Count 1 from the Form of the Verdict, (6) the court refused to dismiss Count 1 of the Indictment and, instead, simply removed it from the jury's consideration, (7) the court refused to strike all evidence related to Count 1, (8) the court denied an instruction defining "letter of intent," (9) the court decided to exclude Count 1, rather than submit it to the jury, (10) the court permitted constructive amendment to the Indictment by removing Count 1 from the jury's consideration, and (11) the court and the government told the jury

many times that Bernegger was charged Count 1 of the Indictment.

### Group 4:  Challenges to Calculation of Restitution under 28 U.S.C. § 2255

The fourth group of claims comprises those in which Mr. Bernegger challenges the calculation of the amount of restitution he must repay to the victims.  These claims include Grounds 15, 17, 18, and part of 31.  At sentencing, trial counsel argued that Bernegger should not be held accountable for monetary losses of people involved in counts for which he was not indicted, found not guilty, or acquitted.  The court rejected that argument and used those amounts in its calculation of the total amount of loss for the purposes of determining offense level and restitution.  On direct appeal, the Fifth Circuit considered the court's calculation, determined that losses arising from the bank fraud charges should not be counted, and subtracted that sum from the total loss.  The Fifth Circuit upheld the remainder of the total loss.  As such, this court may not review that issue under the doctrine of procedural bar.

Another impediment to court's consideration of these grounds for relief is that calculation of restitution is not a proper claim to bring through *habeas corpus* proceedings.  *United States v. Hatten*, 167 F.3d 884, 887 n. 5 (5th Cir.1999); *United States v. Segler*, 37 F.3d 1131, 1135 (5th Cir. 1994).  A challenge to the restitution or fine portion of a sentence is not a constitutional issue regarding sentencing, and it can only be raised on direct appeal.  *Id*.  A district court lacks subject matter jurisdiction to a modify restitution order under § 2255, a writ of *coram nobis*, or "any other federal law."  *Hatten* at 887.  Indeed, a monetary penalty is not even a sufficient restraint on liberty to meet the "in custody" requirements of § 2255 or § 2241.  *Id.*, *Segler*, 37 F.3d at 1167; *see Spring v. Caldwell*, 692 F.2d 994, 998–99 (5th Cir.1982); § 2241(c).  For these reasons, Bernegger's challenges in Grounds 15, 17, 18, and part of 31 as to the amount of restitution he must repay the victims in this

case will be dismissed for failure to state a proper claim under 28 U.S.C. § 2255.

## Group 5: Ineffective Assistance of Counsel

In Grounds 9, 10, 11, 12, 14, 17, 18, 24A, 24B, 28, 31, and parts of 6 and 16, Mr. Bernegger alleges that either trial or appellate counsel rendered constitutionally ineffective legal assistance. The court must address claims of ineffective assistance of counsel under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove that defense counsel was ineffective, Bernegger must show that counsel's performance was deficient and that the deficiency resulted in prejudice to his defense. Under the deficiency prong of the test, the petitioner must show that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The court must analyze counsel's actions based upon the circumstances at the time – and must not use the crystal clarity of hindsight. *Lavernia v. Lynaugh*, 845 F.2d 493, 498 (5th Cir. 1988). Bernegger "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). To prove prejudice, Bernegger must demonstrate that the result of the proceedings would have been different or that counsel's performance rendered the result of the proceeding fundamentally unfair or unreliable. *Vuong v. Scott*, 62 F.3d 673, 685 (5th Cir. 1995), *cert. denied*, 116 S.Ct. 557 (1995); *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *Sharp v. Johnson*, 107 F.3d 282, 286 n.9 (5th Cir. 1997).

## Part of Ground 6: Failure of Appellate Counsel to Raise the Issue
## of the Court's Having Posed a Question to a Witness

In Ground 6 of the instant motion to vacate, set aside, or correct sentence, Mr. Bernegger alleges that the trial court was biased against him. Most of the allegations in Ground 6 are in terms of

direct actions by the court and are procedurally defaulted because Mr. Bernegger did not raise these issues on direct appeal.  Near the end of Ground 6, however, Mr. Bernegger alleges that trial and appellate counsel were ineffective for failing to challenge the following two exchanges between the court and Craig Trebatoski, Mr. Bernegger's brother-in-law and reluctant witness for the prosecution. In the first exchange, the court posed a question to Mr. Trebatoski regarding how he received a copy of Bernegger's business plan, asking, "Let me ask a question of this witness before we go on.  How did you get the business letter?"  T. 209.  According to Mr. Bernegger, Trebatoski responded, ". . . either it was sent via email or by postal mail."  T. 209.  In the second exchange, the court inquires of Trebatoski, "Anyway, you are listed, I think, in the indictment as – I will use the word – victim; is that fair enough?"  T. 232.  As discussed below, both of the court's queries were improper.

As to the question found on page 209 of the trial transcript, the court was merely inquiring as to Mr. Trebatoski's earlier testimony, as he had already testified on pages 200-201 that he had received a copy of the We-Gel business plan either through email or traditional mail.  Mr. Bernegger implies, incorrectly, that the court elicited *the only testimony given* regarding the element of using the mail or electronic communication.  However, in addition to Trebatoski's testimony regarding the We-Gel business plan, he also testified on pages 204-206 of the trial transcript that he sent checks and received glowing written communications regarding We-Gel's viability and fitness as a business, while never receiving such communication regarding the very real difficulties the business faced.  This testimony also constitutes evidence of use of the mail or electronic communication.  Further, Mr. Bernegger used an ellipsis to remove the part of Mr. Trebatoski's testimony indicating that he had already testified as to the means by which the document was transmitted.  Trebatoski's full answer to the court's question reads, "*I had mentioned either* it was sent via email or via postal mail.  I don't recall specifically which

method it came." T. 209 (emphasis added). Thus, the court's question regarding the method Mr. Bernegger used to send Mr. Trebatoski a copy of the business plan was, at most, cumulative – and ultimately harmless.

Mr. Bernegger also claims that the court showed bias on page 232 of the trial transcript by stating, "Anyway, you are listed, I think, in the indictment as a – I will use the word – victim; is that fair enough?" Mr. Bernegger implies that the court was trying to drive home Mr. Trebatoski's status as a victim in order to bolster the government's position that Bernegger committed fraud. He has, however, taken the question out of context. To clarify matters, the court will recount the entire exchange below. The court has added emphasis to highlight the question to which Mr. Bernegger objects.

[Mr. Daniels]    Q.  Mr. Trebatoski, when did you learn that you were named in the indictment?

A.  Fall of 2008.

Q.  When?

A.  Fall of 2008, probably September, October, 2008.

Mr. Mims:  Your Honor, could I interject?  It's not an objection.  I would just ask for a clarification.  It's implying that he is named as a defendant, which is not correct.

Mr. Daniels:  I didn't mean to say that.

Mr. Mims:  Maybe I took it wrong.  I wanted to clarify.

Mr. Daniels:  Did I convey that, Your Honor?

The Court:  Well, you conveyed it to somebody, at least Mr. Mims there.  I don't know.  *Anyway, you are listed, I think, in the indictment as a –  I will use the word – victim; is that fair enough?*

Mr. Mims:  Yes, Your Honor.

The Court:  Let's just say, Mr. Daniels, make Mr. Daniels happier, an alleged victim.

Mr. Daniels:  An alleged victim, Your Honor.

In this exchange, the court has joined both the prosecution and the defense in clearing up a potential misconception regarding Mr. Trebatoski's role as set forth in the indictment – that he was characterized in the Indictment as a victim, rather than a perpetrator of fraud.  There is simply no error to be found in the court's statement.  As to these two exchanges, neither trial nor appellate counsel had any grounds to issue a challenge, either through objection or a valid issue for appeal.  As such, the court finds that both trial and appellate counsel rendered effective assistance in deciding not to challenge either exchange.  This ground for relief is wholly without merit and will be denied.

### Parts of Ground 16:  Trial Strategy Regarding Which Witnesses to Call and Documents to Introduce – and Whether to Employ a Private Investigator

In Ground 16, Mr. Bernegger argues that counsel should have called various witnesses, used numerous documents, and also should have made use of a private investigator that Bernegger procured.  Each of these allegations is without merit, and they will be dismissed.

### Uncalled Witnesses

The decision to call witnesses is a trial strategy within the trial counsel's domain.  *United States v. Harris*, 408 F.3d 186, 190 (5th Cir. 2005), *cert. denied*, 546 U.S. 919, 126 S.Ct. 297 (2005); *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).  Complaints about the failure to call witnesses are disfavored on collateral review because allegations of potential testimony are largely speculative.  *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986).  The court should thus view such claims with skepticism, especially when the only evidence of what a witness's testimony would

have been is from the movant. *Id.* The movant must also show that the testimony would have been favorable and that the witness would have testified at trial. *Alexander*, 775 F.2d at 602.

In this case, Mr. Bernegger states that he identified 46 witnesses counsel should have interviewed to aid in his defense. Bernegger has, however, listed only a handful of these witnesses – and has offered only his personal speculation as to their prospective testimony. "[C]omplaints of uncalled witnesses are not favored in federal *habeas corpus* review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *see also Buckley v. Collins*, 904 F.2d 263, 266 (5th Cir. 1990); *Lockhart v. McCotter*, 782 F.2d at 1282. "[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the contents of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day*, 566 F.3d at 538; *Alexander v. McCotter*, 775 F.2d at 602 (to demonstrate error, or ineffective assistance of counsel, the petitioner must prove that a witness's testimony would have helped him, and that the witness would have testified to certain facts or information at trial).

Mr. Bernegger has not submitted an affidavit from any witness setting forth, in the witness' words, his potential testimony; nor has he clearly shown how the purported testimony of these potential witnesses would have altered the outcome of trial. Bernegger has not offered proof that the witnesses would have testified – and that their testimony would have been favorable to him. "[T]he determination as to what witnesses to call is squarely within counsel's professional judgment. *See Green v. Cockrell*, 67 F. App'x 248 (5th Cir. 2003) ("A strategic or tactical decision not to call particular

witnesses does not constitute ineffective assistance.")  Great deference is given to counsel's exercise of professional judgment.  *Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988)."  Mr. Bernegger only identified a few such witnesses; however, a review of their potential testimony does not show that the outcome of trial would probably have been different had they testified.

### David Beard, President of Great American Foods ("GAF")

Mr. Bernegger was convicted of mail fraud as charged in Count 4 of the Indictment because he informed investors that he possessed a signed letter of intent from GAF – a company that was exploring the potential for a business relationship with We Gel.  Several investors testified that they invested more money with We Gel because of the purported letter of intent.  Mr. Bernegger argues in the instant motion that he had:  a signed confidentiality agreement, numerous communications showing that GAF was quite interested in dealing with We-Gel, a confidentiality agreement signed by Larry Mobley (an independent broker facilitating dealings between the companies), and personal meetings and tours with David Beard, President of GAF.  Peter Bernegger did not, however, have a letter of intent – a document memorializing the intentions of We Gel and GAF to enter into a formal contract.  He argues now that the sum of the documents he *did*  possess – coupled with his visits and other contacts with GAF – amounted to a letter of intent, and he argued the same thing at trial.  The government argued that the totality of contact between the companies did not amount to a letter of intent – that a letter of intent must be a document clearly showing the intent to enter into a contract. This is simply a question of fact for the jury to decide, and the jury agreed with the government. These facts do not state a claim for relief under 28 U.S.C. § 2255.

## Dr. Gary Manners

According to Mr. Bernegger, Dr. Manners is a top research scientist for the USDA-Albany, CA office and, again according to Mr. Bernegger, would have testified regarding the efficacy of limonin as a cancer-fighting agent. Mr. Bernegger believes that Dr. Manners would also have confirmed that Bernegger's statement of the market price for limonin to CPI investors was accurate – and that the price stated by the government's witnesses was not. Bernegger also believes that Dr. Manners would have testified that he gave a sample of 85% pure limonin to CPI for use in starting its own production of limonin. Mr. Bernegger believes that this testimony would have impeached several government witnesses who testified about the manufacture, pricing, and source of limonin. Even if Dr. Manners had been called and had testified as Mr. Bernegger suggests, the court finds that the testimony would have done little to alter the jury's guilty verdict. Though there was a dispute regarding the potential sale price of limonin, the bigger problem for Bernegger was CPI's inability to produce commercially viable amounts of it. Indeed, the fact that CPI needed Dr. Manners to provide a sample of 85% pure limonin suggests that the company was unable to produce its own. As such, the court finds that this claim for relief is without merit.

## Dr. White and Marcia White

Dr. White and his wife, Marcia, own Nutra West in Wyoming, a "nutraceutical" company dealing in over-the-counter health medications for over 20 years. Bernegger believes that either of these witnesses, if called, would have testified as to the market price for limonin, depending on its purity – and that all of their dealings with CPI were through Stephen Finch, not Bernegger. The court cannot discern facts the Whites could have conveyed to the jury that would have substantially benefitted Bernegger. Again, testimony from these witnesses, if the jury believed them, would only

have impeached government witnesses on a peripheral issue – the market price of limonin.  The

government's case rested on proof that Bernegger deceived investors as to CPI's ability to get limonin

to market.  The evidence introduced at trial showed that, though Bernegger kept assuring investors

that the limonin business was proceeding apace, CPI either could not produce limonin at all, or could

not produce it in in volume or purity sufficient to make it a commercially feasible product.  In

addition, though it appears that Mr. Finch was the primary point of contact with Nutra West,

Bernegger, himself stated in a July 2, 2004, email to Scott Johnson that he was in communication with

the company: "Dr. Brimhall called back from Nutra West and they confirmed that the limonin sample

we sent them was 85% purity.  This is an important first step that we did what we told him we'd do.

Next week I will be talking with them about purchasing."  Government's Exhibit 6.  It does not appear

that calling the Whites as witnesses would have changed the outcome of trial.

### Mike Kessler and Terry O'Malley

Kessler and O'Malley worked with Putnam Ethanol/BioProducts, and Bernegger believes that

they would have testified as to the firm nature of dealings between Putnam and CPI – including

contracts standing by, awaiting only financing by PNB Parbus Bank.  Bernegger believes that this

testimony would have impeached that of several government witnesses as to the dealings of CPI with

Putnam.  Similar to the discussion above, it does not appear that the testimony of these witnesses

would have changed the outcome of trial.  The government conceded that Bernegger and others

worked very hard to make both We Gel and CPI profitable.  The government's argument, which the

jury accepted, was that Bernegger misled the investors by reporting only positive developments – and

exaggerating how much the manufacturing processes and business relationships had developed.  Even

if Kessler and O'Malley had testified as Bernegger suggests, their testimony would have shown only

that one business – Putnam – and CPI had entered into negotiations, pending loan approval. It does not appear that the testimony would have established that CPI was producing marketable amounts of product to sustain such a deal – or was otherwise ready to produce the kind of revenue Bernegger kept reporting to the investors. The court finds that the proposed testimony of the Kessler and O'Malley would probably not have led to Bernegger's acquittal, and this issue is without merit.

### Documents and Private Investigator

Mr. Bernegger provided counsel with over 100,000 documents that he believes would have shown that his representations to the investors regarding the ability of We Gel and CPI to produce saleable product – and the existence of customers – were true. He also believes that trial counsel should have interviewed 46 potential witnesses – and hired a private investigator. Bernegger argues that counsel was ineffective as to his decisions regarding: which documents to use, which witnesses to call, and whether the employ the private investigator Bernegger selected.

### Documents

Counsel informed Mr. Bernegger that 100,000 documents was too many to comb through and told him to "just go through them and see which ones you want to use at trial." Bernegger conducted a review, then sent a whopping 16,000 documents to trial counsel. When, at trial, Bernegger would mention one of the 100,000 documents, he seemed surprised that counsel could not recall it. In the instant § 2255 motion, Bernegger suggests that counsel should have pored over those 16,000 to 100,000 documents – and committed the significance of each one to memory.

Bernegger's position is absurd. Based upon the indictment and interaction with the government and his attorney, Bernegger knew exactly what charges the government had brought. He knew that the government would try to prove that We Gel and CPI had few, if any, customers – and

had never produced a significant amount of saleable product. According to his testimony, Bernegger, himself, conducted the day-to-day operations of the companies and was responsible for a vast amount of contact with suppliers and potential customers – through email, postal mail, telephone, fax, and other means. As Mr. Bernegger was the central figure in charge of CPI and We Gel, then he, not counsel, was in the best position to identify the documents most critical to his defense. If such documents existed, then he could have identified them and passed them on to his attorney. Indeed, according to Mr. Bernegger, counsel advised him to do just that.

Thus, Bernegger ignored counsel's sound advice – and shipped *tens of thousands* of documents, in paper and electronic format, to his attorney. He apparently expected his attorney – who was unfamiliar with the day-to-day operations and intricacies of We Gel and CPI – to sift through a mountain of documents, determine the relevance of each one, and identify the ones that would most likely defeat the government's case. This would have been a monumental waste of his attorney's time – and (as Bernegger was proceeding as a pauper) the government's money.

Mr. Bernegger needed only to provide his attorney with documents showing that CPI and We Gel had executed a contract with several customers, created a significant amount of product, shipped the product to the customers – and had invoiced the customers a significant amount of money for that product. It would also have further aided his defense if he could have produced bank statements showing that CPI and We Gel had deposited a significant amount of funds from the sale of products the companies had manufactured. Cash in the bank is, of course, more desirable than accounts receivable. Even if such funds were not enough to generate a profit, that kind of documentation would have gone a long way towards refuting the government's claim that Bernegger's representations were a gross overstatement of the two companies' viability.

However, out of over 100,000 documents, including emails, photos, DVDs, and video, Bernegger could not come up with any such proof. Mr. Bernegger states that he gathered and printed the documents in question – and was aware of their contents. If this is true, then *that* was the time to pull out the truly important ones and send them to his attorney. He chose not to – and instead simply dumped a colossal number of documents upon defense counsel in the time leading up to trial. Bernegger would only have needed about 50 documents or so to show that his businesses were viable – and he had thus told the truth to the investors. Peter Bernegger simply refused to do so, and the court finds that counsel rendered effective assistance by insisting that Bernegger provide a reasonable amount of documents to refute the government's case. This issue is without merit and will be denied.

**Private Investigator**

Mr. Bernegger procured the services of a private investigator and argues that counsel was ineffective for failing to arrange for payment of the investigator or otherwise make use of his services. According to Bernegger, the private investigator could have obtained information regarding: (1) damage done to 2 of Bernegger's computers, (2) suppression of that information, (3) foreign customers of the companies, (4) previous scams conducted by Stephen Finch, (5) Craig Trebatoski's unwillingness to pursue criminal charges against Bernegger, (6) alleged witness tampering regarding former United States Bankruptcy Judge David W. Houston, III and others, (7) contact by the prosecutor with potential witnesses and members of Mr. Bernegger's family, and (8) Bernegger's contacts and dealings with David Beard, CEO of Great American Foods ("GAF"). The court holds that counsel's decision not to use the services of Mr. Bernegger's private investigator was sound.

As discussed above, Mr. Bernegger, himself, states that he had more than enough information from 5 operational company computers to aid in his defense. Mr. Bernegger, however, failed to

provide that information to his attorney in a reasonable and useful way. Instead of simply providing a small number of relevant documents to his attorney, Bernegger sent him tens of thousands of documents. Thus, Bernegger failed to adequately assist in his defense, and counsel provided effective assistance in this regard. As Bernegger has conceded in Ground 16 of the instant § 2255 motion that the information from the five operational computers was sufficient to aid in his defense, counsel's decision not to pursue the issue of the two damaged computers was sound. The same is true of counsel's decision not to use the private investigator to seek information regarding the existence of foreign customers.

Further, the fact that Stephen Finch may have conducted scams in the past simply is not relevant to the issue of Bernegger's fraud in the present case. The gravamen of the government's case against Bernegger was that he: (1) told investors over and over that the businesses were viable and vibrant – with many customers and plenty of money coming in, (2) did *not* tell investors that there were serious production problems, and (3) did *not* tell investors that the businesses had very few, if any, actual paying customers. Bernegger alleges that Finch misled him by stating that the process to make fish gelatin had been perfected when it had not been; however, Bernegger also alleges that he *did* perfect the process after he forced Finch to leave the company. Thus, much of Bernegger's illegal conduct occurred *after* Finch's departure – and *after* Bernegger knew of Finch's deception. Bernegger's counsel rendered effective assistance in deciding not to use a private investigator to pursue information regarding Finch's prior business dealings, as they were not relevant to the charges against Bernegger.

In addition, when Bernegger testified at trial, the government – time and again – asked him whether Mr. Finch had deceived or defrauded him. Over and over, Mr. Bernegger said Finch had not,

- 25 -

even when the government produced several scathing documents Bernegger had drafted excoriating Finch for lying about his credentials, the efficacy of the fish gelatin production process, and other matters. Given Mr. Bernegger's reticence on this matter at trial, the court will not second-guess counsel's decision not to pursue the matter with a private investigator.

Bernegger believes that trial counsel should have used a private investigator to show that investor Craig Trebatoski did not consider himself a victim and did not wish to pursue criminal charges against Bernegger. First, the government need not obtain a crime victim's permission in order to pursue charges against a defendant. Mr. Trebatoski was a reluctant participant in the prosecution, in part because he is Mr. Bernegger's brother-in-law. He was not interested in pursuing criminal charges against Mr. Bernegger. Nonetheless, the government properly used Mr. Trebatoski as a witness – and used his losses in computing Bernegger's sentence and restitution. Indeed, Mr. Trebatoski actually testified at trial that he did not wish to pursue criminal charges against Mr. Bernegger; thus, the jury considered that information in reaching its verdict. As such, counsel provided effective assistance in deciding not to use a private investigator to procure this information.

### Alleged Witness Tampering and Other Matters

Mr. Bernegger also alleges that counsel should have used the private investigator to show that the government contacted various witnesses, including a former bankruptcy judge, and conducted a "shakedown" of Mr. Bernegger's family. First, the government may contact and speak with potential witnesses during the course of a prosecution. Second, Mr. Bernegger has not alleged what information he believes the government exchanged with potential witnesses. Given the complete absence of specific facts to support an allegation of wrongdoing, the court holds that counsel provided effective assistance in deciding not to use the private investigator to explore this issue.

Bernegger also alleges that the prosecution committed malfeasance by conducting a "shakedown" of a family member – by stating that, if Bernegger's family would pay restitution to the victims, then the government would agree for Mr. Bernegger to plead guilty to one count – and recommend a sentence of probation. If Mr. Bernegger's family had been willing to do so, then both Bernegger and the victims would have benefitted. The government's offer was a fair one, and Mr. Bernegger has made no showing at all that the offer was improper. As such, counsel's decision not to hire an investigator as to this matter was sound.

Finally, Mr. Bernegger believes that counsel should have used the investigator to reveal the dealings that Bernegger had with David Beard, Chief Executive Officer of GAF, who was too ill to attend trial. Mr. Bernegger believes that Beard's testimony would have shown that the sum of agreements and contact between We Gel and GAF constituted a letter of intent. The court discussed Mr. Beard's likely testimony above – and found that such testimony would probably not have altered the outcome of trial. The jury had such evidence before it and found Bernegger guilty nonetheless. Counsel's decision not to seek more information about this topic through a private investigator was sound.

### Failure to Obtain Proof Regarding We Gel's Customers and Viable Product

Mr. Bernegger alleges that counsel was ineffective for failing to obtain proof to show that: (1) We Gel sold product to 6 customers, (2) We Gel made viable product, (3) We Gel's business plan was viable, (4) We Gel had extensive dealings with the Navy, and (5) Finch defrauded Bernegger. None of these claims has merit. As set forth above, Mr. Bernegger states that the information he obtained prior to trial from five of his business computers would have shown that: We Gel sold a viable product to

various customers and that he had entered into talks with the Navy about providing biodegradable packing wrap made from fish gel.  Rather than providing a few documents showing these facts to counsel in a useable form, he sent a blizzard of documents – tens of thousands – such that counsel could not reasonably retrieve the relevant ones.  When counsel asked Bernegger to identify and send *only the relevant documents*, Bernegger sent another barrage of over 16,000 documents.  The court will not hold counsel accountable for Mr. Bernegger's failure to cooperate reasonably in his own defense.

Bernegger also alleges that Stephen Finch tricked him – stating that the process for making fish gelatin was perfected when it was only partially worked out.  As discussed above, Finch's alleged trickery does not shield Bernegger from his misleading statements to investors.  Also, though Bernegger is now strident in his accusations of fraud against Finch, when Bernegger testified at trial, he repeatedly refused to say that Finch had committed fraud.  These claims of ineffective assistance of counsel are without merit and will be denied.

Bernegger further alleges that counsel was ineffective for failing to obtain proof that the We Gel business plan was viable.  The evidence at trial showed that multiple people, including lawyers and sophisticated investors, reviewed the We Gel business plan and found it to be satisfactory.  Counsel ensured this proof was presented to the jury; as such, this claim for relief is without substantive merit.

### Ground 9:  Appellate Counsel Should Have Claimed Error Based Upon the Unavailability of Leo Bieneck as a Witness

In Ground 9, Mr. Bernegger notes that Leo Bieneck, a potential witness that the government presented as a victim of fraud, passed away before trial.  Bernegger believes that appellate counsel

should have argued on appeal that Mr. Bieneck's absence violated Bernegger's Sixth Amendment right to confront witnesses against him. This issue is without merit.

The Confrontation Clause of the Sixth Amendment – which applies to the States through the Fourteenth Amendment – sets forth that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI; *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). "If one were to read this language literally, it would require, on objection, the exclusion of any statement made by a declarant not present at trial." *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531 (1980) (abrogated on other grounds). The Confrontation Clause reflects "a preference for face-to-face confrontation at trial, and that 'a primary interest secured by [the provision] is the right of cross-examination.'" *Id*. (quoting *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)) (footnote omitted). When a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause requires a showing that he is unavailable – and that the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 1374 (2004).

First, as Leo Bieneck had passed away before trial, he was obviously unavailable and could not testify. Second, the prosecution introduced no testimonial evidence at all from him. All of the information regarding Leo Bieneck came from his relative, Donnie Kisner, who did not relate any statement by Mr. Bieneck to the jury. As such, he was not a witness against Mr. Bernegger; there was no hearsay, and the Confrontation Clause has no application as to Mr. Bieneck. Bernegger's attorney had the opportunity to cross-examine Mr. Kisner and did so. As the Fifth Circuit noted on direct appeal, Donnie Kisner testified that he received information from Peter Bernegger, invested more money in We Gel because of that information, then told his relative, Leo Bieneck. Mr. Bieneck

invested more money in We Gel shortly thereafter.  The Fifth Circuit held that "[s]ufficient evidence supports the jury's verdict that Bernegger's misrepresentations caused Bieneck to invest money in We Gel."  Appellate counsel thus had no basis upon which to raise a Confrontation Clause challenge; as such, this issue is without substantive merit.

### Ground 14:  Counsel Failed to Make Use of the Government's Stipulation Regarding We Gel's Efforts to Create a Product

Bernegger argues in Ground 14 that counsel failed to use a stipulation by the government to full advantage.  The government stipulated that the employees and leaders at We Gel tried to produce fish collagen – and succeeded in producing small amounts.  Mr. Bernegger believes that the stipulation rises to the level of an admission that his statements to investors were not fraudulent – and that counsel rendered ineffective assistance in failing to convince the jury that Bernegger was not guilty of fraud.  This argument is wholly without merit.  First, whether Mr. Bernegger committed fraud was a decision for the jury.  Members of the jury heard the government's stipulation and obviously came to the conclusion that it was not decisive on the issue of fraud.  Second, the government never took the position that Mr. Bernegger, from the very beginning, had no plan to produce fish collagen or limonin – or to make a profit selling them.  Bernegger's personal investments in We Gel and CPI – and the amount of time and effort he expended trying to make them work – weigh against such an argument.  Instead, the government consistently argued that Mr. Bernegger deceived investors by repeatedly presenting them with overwhelmingly positive reports regarding the production capability and financial status of We Gel and CPI, while concealing the fact that the companies were experiencing production problems and had accumulated few, if any, paying customers.  Defense counsel presented arguments on this point to the jury, but the jury ultimately

voted to convict. Bernegger's counsel rendered effective assistance regarding his arguments against a finding of fraud, and this ground for relief is without substantive merit.

### Remaining Ineffective Assistance of Counsel Grounds in Group 5

The remaining claims in Group Five (ineffective assistance of counsel) are Grounds 10, 11, 12, 17, 18, 24A, 24B, 28, 31, and Parts of 6 and 16. Mr. Bernegger cannot sustain an ineffective assistance of counsel claim on these grounds because the underlying claims are without merit.

Bernegger's claim in Ground 18 involves his belief that the government failed to put on any proof that Craig Trebatoski, who invested $100,000, received inaccurate information from Bernegger through the mail. Trebatoski's name was mentioned only in Count 2, on which Bernegger was found not guilty. As such, Bernegger argues that the $100,000 should not have been used in the total loss calculation or to determine restitution. Trebatoski was, however, listed in the Presentence Investigation Report as a victim who lost $100,000. Trial counsel objected to using the sums that Trebatoski and others had invested in the calculation, but the court overruled the objection. Bernegger did not raise this issue on direct appeal. As trial counsel objected, the court cannot find that he provided ineffective assistance regarding this issue. Bernegger has not alleged ineffective assistance of appellate counsel as to this issue.

In Grounds 10, 11, 12, 17, 24A, 24B, and 28, the Fifth Circuit Court of Appeals has already decided the underlying issues; as such, the ineffective assistance of counsel claims based upon those issues must be denied. Grounds 10 and 11 involve the testimony of Donnie Kisner regarding a confidentiality agreement. Ground 12 involves the propriety of having the jury decide whether the sum of contact between Bernegger and GAF constituted a "letter of intent." Ground 17 involves whether the amount of money lost by investors in CPI should have been used to determine the total

loss and restitution. Grounds 24A, 24B, and 28 involve the removal of Count 1 of the indictment from the jury's consideration by amending the Form of the Verdict. The Fifth Circuit Court of Appeals has found each of these underlying issues against Bernegger; as such, he may not now resurrect them by recasting them in terms of ineffective assistance of counsel. These grounds for relief will therefore be denied.

In Ground 31, Mr. Bernegger argues that the government withheld the summary of an interview with Clark Young, who invested $75,000 in Mr. Bernegger's business. As discussed in the section below, the underlying claim regarding his ground is without merit; as such, the court may not find that counsel was ineffective based upon his actions as to the underlying claim.

### Group 6: Prosecutorial Misconduct (Grounds 7, 8, 31, and Parts of Ground 5)

Mr. Bernegger states that he only recently discovered facts to support his allegations in parts of Ground 5, and in Grounds 7, 8, and 31, and, for this reason, he argues that he should be excused for not seeking review of the issues on direct appeal. Though it is unclear whether Mr. Bernegger has met any of the tests for overcoming procedural default, it is more efficient simply to review the issues on the merits. Bernegger's remaining claims in Ground 5 center on actions by the government that he believes were improper: (1) suppression of FBI laboratory test results regarding the content of fish collagen, (2) confiscation of fish collagen from two investors, (3) offering a plea deal to one of Bernegger's potential witnesses, (4) knowingly permitting perjury from Susan Hurst, Donnie Kisner, Bruff Sanders, and David Cooper, (5) promulgating "victim letters" to people who may have lost money after investing in We Gel and CPI, and (6) permitting the case, with various alleged errors, to proceed on appeal.

Ground 7 duplicates Bernegger's claim in Ground 5 that the government suppressed FBI test

results regarding the content of collagen powder samples.  Similarly, Ground 8 duplicates Bernegger's claim from Ground 5 that the government promulgated "victim letters" to various people who might have suffered financial harm after investing in CPI or We Gel.  Finally, in Ground 31, Mr. Bernegger argues that the government suppressed a report detailing an interview with victim Clark Young, who stated that he handed Mr. Bernegger checks totaling $75,000, rather than sending them through the mail.  Bernegger argues that, as the checks did not go through the mail, they should not have been used to compute either the total loss or restitution.  None of these grounds for relief has merit.

A claim of prosecutorial misconduct must be specific and supported by evidence.  *United States v. Jones*, 614 F.2d 80, 82 (5th Cir. 1980).  As Mr. Bernegger has offered little more than his assertions as to any of the allegations of misconduct, all of his claims will be denied for that reason. The court will, however, discuss the substance of the claims in turn below.

### The Samples of Fish Collagen Powder

Mr. Bernegger apparently sent two investors unmarked plastic bags of fish collagen powder allegedly produced at the We Gel facility.  He did not, however, include any correspondence or otherwise identify the contents of the packages.  The witnesses contacted the United States Attorney's Office, and the FBI investigated, as all were concerned that the packages might contain a harmful chemical or pathogen.  FBI tests revealed that the packages contained no harmful substances.  Mr. Bernegger believes that the FBI tests show that the We Gel fish collagen powder was viable for commercial use and of high quality, but he has not supported his belief with documentary evidence. The FBI was testing for harmful substances, not commercial suitability, and Bernegger has not shown that the tests yielded results showing the quality and utility of the powder.

Even if the tests showed that the powder was commercially viable, the results would not have aided in Bernegger's defense. The government stipulated that We Gel attempted to make viable fish collagen and produced a small amount. Thus, presenting the small collagen samples to the jury would have been merely cumulative – and would not have led to Bernegger's acquittal. These grounds for relief are without merit and will be denied.

## Government "Suppression" of an Interview with Investor Clark Young

In Ground 31, Mr. Bernegger states that, in response to a Freedom of Information Act request, he received information regarding an interview with investor Clark Young. In his interview, Mr. Young states that he handed, rather than mailed, Mr. Bernegger checks totaling $75,000 – and that he received his information regarding Bernegger's companies firsthand, rather than through the mail. Bernegger argues that, as those checks did not pass through the mail, they were not part of the mail fraud scheme and cannot be used to compute the total loss or amount of restitution. This argument is without merit. First, as discussed above, the amount of restitution cannot be challenged through 28 U.S.C. § 2255. Second, the Fifth Circuit determined the total loss amount to be $1,725,000. Under the Sentencing Guidelines, any loss amount between $1,000,000 and $2,500,000 results in the same 16-level increase. *See* United States Sentencing Guidelines § 2B1.1(b)(1). Even if the court were not to consider the $75,000 at issue here, the total loss amount would be $1,650,000 – and would also yield the same 16-level increase. This issue is without merit and will be dismissed.

## Remaining Grounds for Relief

Mr. Bernegger does not support any of his remaining grounds for relief with evidence. He states that the government offered a plea deal to one of his witnesses, but he does not identify the witness – or provide any authority to establish that doing so is inappropriate. The government is free

to offer a plea agreement to any defendant.  As such, this allegation fails to state a claim for relief.  He states that the government knowingly permitted perjury from Susan Hurst, Donnie Kisner, Bruff Sanders, and David Cooper.  Mr. Bernegger has not, however, offered evidence to show that any of these witnesses lied under oath; nor has he presented proof that, if any witness perjured himself, the government's attorneys knew about it.  Mr. Bernegger also states that the FBI promulgated "victim letters" to various people who might have invested in We Gel or CPI.  He argues that the letters were an attempt to convince the investors that he was a criminal and they were victims.  This argument is without merit.  The government is permitted to speak to witnesses to identify potential victims of a crime, and one of the ways to locate them is to send letter to potential victims advising them of the existence of the criminal investigation – and how they might participate in it.  Mr. Bernegger has pointed to nothing untoward in the letters.  As such, this ground is without merit.  Finally, Mr. Bernegger argues that the government and the court permitted the case, with all of its alleged flaws, to proceed to the Fifth Circuit on appeal.  This ground for relief is completely without merit.  Initially, the court notes that Bernegger, himself, initiated the appeal.  Further, once he did so, neither the government nor the court can prevent the appeal from moving forward, as the district court loses jurisdiction once a notice of appeal is filed.  *Maresse v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 379, 105 S.Ct. 1327, 1331, 84 L.Ed.2d 274 (1985) ("In general, filing of a notice of appeal confers jurisdiction on the court of appeals and divests the district court of control over those aspects of the case involved in the appeal.")  In addition, the very purpose of an appeal is for the aggrieved party to *identify flaws in the case* so that the appellate court might remedy them.  This final ground for relief is without substantive merit and will be denied.

## Conclusion

In sum, the claims in the instant Motion to Vacate, Set Aside, or Correct Sentence are either procedurally defaulted, procedurally barred, or without substantive merit, and the motion will be denied. A final judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this, the 9th day of March, 2015.

/s/ **MICHAEL P. MILLS**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**